No. 2013-1459

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

AZURE NETWORKS, LLC AND TRI-COUNTY EXCELSIOR FOUNDATION,
*Plaintiffs-Appellants*,

*v.*

CSR PLC AND CAMBRIDGE SILICON RADIO INTERNATIONAL, LLC,
*Defendants-Appellees*,

*and*

ATHEROS COMMUNICATIONS, INC. AND QUALCOMM INCORPORATED,
*Defendants-Appellees*,

*and*

BROADCOM CORPORATION,
*Defendant-Appellee*,

*and*

MARVELL SEMICONDUCTOR, INC., RALINK TECHNOLOGY CORPORATION (TAIWAN),
AND RALINK TECHNOLOGY CORPORATION (USA),
*Defendants-Appellees*.

On Appeal from the United States District Court
for the Eastern District of Texas, in case no. 11-cv-139, Judge Michael Schneider

## NON-CONFIDENTIAL BRIEF FOR DEFENDANTS-APPELLEES

**COUNSEL INFORMATION ON INSIDE COVER**

October 3, 2013

DOMINIC E. MASSA
LOUIS W. TOMPROS
JASON H. LISS
DANA O. BURWELL
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

*Attorneys for Defendant-Appellee
Broadcom Corporation*

TIMOTHY TETER
LORI R. MASON
MATTHEW J. BRIGHAM
COOLEY LLP
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA  94306
(650) 843-5000

*Attorneys for Defendants-Appellees
Atheros Communications, Inc. and
Qualcomm Incorporated*

JEFFREY E. OSTROW
JONATHAN C. SANDERS
SIMPSON THACHER & BARTLETT LLP
2475 Hanover Street
Palo Alto, CA  94304
(650) 251-5000

KERRY L. KONRAD
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY  10017
(212) 455-2000

*Attorneys for Defendants-Appellees
CSR PLC, Cambridge Silicon Radio
International, LLC, Marvell
Semiconductor, Inc., Ralink
Technology Corporation (Taiwan), and
Ralink Technology Corporation (USA)*

## CERTIFICATE OF INTEREST

Counsel for Defendant-Appellee Broadcom Corporation certifies the following:

1.    The full name of every party or amicus represented by me is:

Broadcom Corporation.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me:

None.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

WILMER CUTLER PICKERING HALE AND DORR LLP:  Dominic E. Massa, Louis W. Tompros, Michael A. Diener, Ronald R. Demsher, Bethany Stevens, Jason H. Liss, Dana O. Burwell

ONE LLP:  Joseph K. Liu, Christopher W. Arledge

POTTER MINTON PC:  Michael E. Jones, Allen F. Gardner

Dated:  October 3, 2013                    /s/ Dominic E. Massa
                                           Dominic E. Massa

                                           *Counsel for Defendant-Appellee*
                                           *Broadcom Corporation*

## CERTIFICATE OF INTEREST

Counsel for Defendants-Appellees Atheros Communications, Inc. and Qualcomm Incorporated certifies the following:

1.    The full name of every party or amicus represented by me is:

    Qualcomm Incorporated, Qualcomm Atheros, Inc. (formerly known as Atheros Communications, Inc.)

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me:

    None.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

    Qualcomm Incorporated (parent of Qualcomm Atheros, Inc.).

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

    COOLEY LLP: Timothy S. Teter, Matthew J. Brigham, Lori R. Mason, Jeffrey S. Karr

    FORMERLY WITH COOLEY LLP: Jesse Dyer

    POTTER MINTON PC: Michael E. Jones, Allen F. Gardner

Dated: October 3, 2013        /s/ Matthew J. Brigham
                                Matthew J. Brigham

                                *Counsel for Defendants-Appellees Atheros Communications, Inc. and Qualcomm Incorporated*

# CERTIFICATE OF INTEREST

Counsel for Defendants-Appellees CSR plc, Cambridge Silicon Radio International LLC, Marvell Semiconductor Inc., Ralink Technology Corporation [Taiwan], and Ralink Technology Corporation [USA] certifies the following:

1.  The full name of every party or amicus represented by me is:

    CSR plc, Cambridge Silicon Radio International LLC, Marvell Semiconductor Inc., Ralink Technology Corporation [Taiwan], and Ralink Technology Corporation [USA]

2.  The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me:

    None.

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

    **<u>CSR</u>**

    Schroders plc owns 10% or more of CSR plc's ordinary Shares. Cambridge Silicon Radio International LLC is a wholly-owned subsidiary of CSR Technology Singapore Pte. Ltd., which is a wholly-owned subsidiary of CSR Technology (Cayman) Ltd., which is a wholly-owned subsidiary of Cambridge Silicon Radio Ltd., which is a wholly-owned subsidiary of CSR plc.

    **<u>Marvell</u>**

    Marvell Semiconductor Inc. is a subsidiary wholly-owned by Marvell Technology, Inc. and Marvell Semiconductor Israel Ltd., and is an indirect subsidiary of Marvell Technology Group Ltd. Marvell Technology Group Ltd. is a publicly traded company, and no publicly held corporation owns 10% or more of its stock.

## Ralink

Ralink Technology Corp. [Taiwan] is a subsidiary of MediaTek, Inc., a Taiwanese publicly held company. MediaTek, Inc. indirectly holds 10% or more of the stock of MediaTek USA Inc., which holds 10% or more of the stock of Ralink Technology Corp. [USA].

4.   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

### For CSR plc and Cambridge Silicon Radio International LLC

SIMPSON THACHER & BARTLETT LLP: Jeffrey E. Ostrow, Kerry L. Konrad, Victor Cole, Jonathan C. Sanders, Gregory T. Chuebon, Colman D. McCarthy

FORMERLY WITH SIMPSON THACHER & BARTLETT LLP: Arun K. Goel

DLA PIPER USA LLP-HOUSTON: Claudia Wilson Frost

MANN, TINDEL & THOMPSON, ATTORNEYS AT LAW: Andy Tindel

### For Marvell Semiconductor Inc.

SIMPSON THACHER & BARTLETT LLP: Jeffrey E. Ostrow, Kerry L. Konrad, Victor Cole, Jonathan C. Sanders, Gregory T. Chuebon, Colman D. McCarthy

FORMERLY WITH SIMPSON THACHER & BARTLETT LLP: Arun K. Goel

MANN, TINDEL & THOMPSON, ATTORNEYS AT LAW: Andy Tindel

### For Ralink Technology Corp. [Taiwan] and Ralink Technology Corp. [USA]

SIMPSON THACHER & BARTLETT LLP: Jeffrey E. Ostrow, Kerry L. Konrad, Victor Cole, Jonathan C. Sanders, Gregory T. Chuebon, Colman D. McCarthy

FORMERLY WITH SIMPSON THACHER & BARTLETT LLP: Arun K. Goel

MANN, TINDEL & THOMPSON, ATTORNEYS AT LAW: Andy Tindel

FORMERLY WITH FREITAS TSENG & KAUFMAN LLP: James H. Lin

Dated:  October 3, 2013

/s/ Jeffrey E. Ostrow
Jeffrey E. Ostrow

*Counsel for Defendants-Appellees
CSR plc, Cambridge Silicon Radio
International LLC, Marvell
Semiconductor Inc., Ralink
Technology Corporation [Taiwan],
Ralink Technology Corporation
[USA]*

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ...................................................................i

CERTIFICATE OF INTEREST ................................................................ ii

CERTIFICATE OF INTEREST ............................................................... iii

TABLE OF AUTHORITIES ................................................................. viii

STATEMENT OF RELATED CASES ....................................................1

STATEMENT OF ISSUES ON APPEAL ...............................................3

INTRODUCTION .................................................................................3

STATEMENT OF THE CASE ...............................................................6

STATEMENT OF FACTS .....................................................................7

    A.    Background ...........................................................7

    B.    The Patent-In-Suit .............................................10

SUMMARY OF THE ARGUMENT .....................................................12

ARGUMENT ......................................................................................13

I.    STANDARD OF REVIEW ................................................................13

II.    THE DISTRICT COURT CORRECTLY FOUND THAT TCEF
    TRANSFERRED ALL SUBSTANTIAL RIGHTS TO AZURE ...................14

    A.    Azure Holds The Most Important Right: The Exclusive
        Right To Enforce The '129 Patent .......................................15

    B.    Other Factors Relevant To Standing Demonstrate That
        Azure Owns All Substantial Rights .....................................17

C.    Appellants' Intent To Transfer Full Control To Azure Cannot Be Squared With Their Belated Attempt To Claim TCEF Retained Substantial Rights ........................................... 19

III.    THE DISTRICT COURT CORRECTLY CONSTRUED "MAC ADDRESS" ...................................................................................... 25

A.    "MAC Address" Is Defined In The '129 Patent As A "Media Access" Address, Which Is Generated By The Hub Device ......................................................................... 26

1.    In the '129 patent, "MAC address" means "Media Access address" ........................................................... 26

2.    The hub device generates the "MAC address" ......................... 30

B.    The District Court Correctly Concluded That The '129 Patent Does Not Use "MAC Address" According To What Appellants Claim To Be The Term's Ordinary Meaning ........................................................................ 38

CONCLUSION ................................................................................................. 43

CERTIFICATE OF COMPLIANCE

## CONFIDENTIALITY STATEMENT

Material has been omitted from pages 4, 7-9, 19, 23-25, 30, and 42 of this brief because these pages describe and contain information concerning business arrangements of the parties and third-parties, which information is subject to a protective order entered in the district court.

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corp.*,
   604 F.3d 1354 (Fed. Cir. 2010) .................................................15, 17, 18, 22

*Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336 (Fed. Cir.
   2006) ......................................................................................................21

*Bell Atlantic Network Services, Inc. v. Covad Communications Group,
   Inc.*, 262 F.3d 1258 (Fed. Cir. 2001) ............................................................35

*CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359 (Fed. Cir. 2002) .................26

*Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448 (Fed. Cir.
   1998) ......................................................................................................13

*Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325 (Fed. Cir. 2010) .................36

*ICU Medical, Inc. v. Alaris Medical Systems, Inc.*, 558 F.3d 1368
   (Fed. Cir. 2009)........................................................................................33

*Intel Corp. v. Broadcom Corp.*, 172 F. Supp. 2d 478 (D. Del. 2001) ....................26

*Intellectual Property Development, Inc. v. TCI Cablevision of
   California, Inc.*, 248 F.3d 1333 (Fed. Cir. 2001) ..........................................14

*Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282 (Fed. Cir. 2010).................................26

*Kinetic Concepts, Inc. v. Blue Sky Medical Group, Inc.*, 554 F.3d 1010
   (Fed. Cir. 2009) ....................................................................................33, 36

*Lighting Ballast Control LLC v. Philips Electronics North America
   Corp.*, 500 F. App'x 951 (Fed. Cir. 2013)................................................2, 14

*MagSil Corp. v. Hitachi Global Storage Technologies, Inc.*, 687 F.3d
   1377 (Fed. Cir. 2012)................................................................................42

*Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313 (Fed. Cir. 2005)....................33

*Moore U.S.A., Inc. v. Standard Register Co.*, 60 F. Supp. 2d 104
(W.D.N.Y. 1999) ........................................................21

*Morrow v. Microsoft Corp.*, 499 F.3d 1332 (Fed. Cir. 2007)... 14, 15, 17, 20, 24, 25

*Networld, LLC v. Centraal Corp.*, 242 F.3d 1347 (Fed. Cir. 2001) ........................29

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) .................26, 27, 28, 33, 39

*Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372 (Fed. Cir. 2000) ...........14, 20, 21

*Propat International Corp. v. RPost, Inc.*, 473 F.3d 1187 (Fed. Cir.
2007) ..............................................................18, 22, 23

*Retractable Technologies v. Becton, Dickinson & Co.*, 653 F.3d 1296
(Fed. Cir. 2011) ........................................................33, 36

*Rite-Hite Corp. v. Kelly Co.*, 56 F.3d 1538 (Fed. Cir. 1995)....................................13

*Saffran v. Johnson & Johnson*, 712 F.3d 549 (Fed. Cir. 2013) ........................33, 36

*SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*,
242 F.3d 1337 (Fed. Cir. 2001) ............................................35, 36

*Sicom Systems, Ltd. v. Agilent Technology, Inc.*, 427 F.3d 971
(Fed. Cir. 2005)..................................................14, 18, 24

*SkinMedica, Inc. v. Histogen Inc.*, --- F.3d ---, 2013 WL 4487603
(Fed. Cir. Aug. 23, 2013)..................................................27

*Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245 (Fed. Cir. 2000)......................16, 22

*Sun Pharmaceutical Industries, Ltd. v. Eli Lilly & Co.*, 611 F.3d 1381
(Fed. Cir. 2010)..................................................29

*Toro Co. v. White Consolidated Industries, Inc.*, 199 F.3d 1295
(Fed. Cir. 1999)..................................................34

*Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*,
944 F.2d 870 (Fed. Cir. 1991) ........................................16, 20, 23

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996)....................35

*Wang Laboratories, Inc. v. America Online, Inc.*, 197 F.3d 1377 (Fed. Cir. 1999)...........................................................................34, 36

*Waterman v. Mackenzie*, 138 U.S. 252 (1891) .......................................................20

*WiAV Solutions LLC v. Motorola, Inc.*, 631 F.3d 1257 (Fed. Cir. 2010) ............................................................................................................24

## STATUTES

28 U.S.C.
    § 1404(a)...........................................................................................1
    § 1406(a)...........................................................................................1

35 U.S.C. § 41(b)(2)............................................................................................22

## STATEMENT OF RELATED CASES

Defendant-Appellees Broadcom Corporation, Qualcomm Inc., and Qualcomm Atheros, Inc. petitioned this Court for a writ of mandamus concerning the District Court's denial of their motion to dismiss or transfer the case pursuant to 28 U.S.C. §§ 1404(a) and 1406(a). This Court denied the petition. *In re Broadcom Corp., Qualcomm Inc., and Qualcomm Atheros, Inc.*, Case No. 13-141 (Fed. Cir. Apr. 23, 2013) (Prost, Moore, O'Malley, JJ.). On June 19, 2013, Broadcom petitioned the United States Supreme Court for a writ of certiorari to review the decision. Case No. 12-1475, *Broadcom Corporation v. United States District Court for the Eastern District of Texas.* As of the filing of this brief, the Supreme Court has not acted on Broadcom's petition.

Appellants Azure Networks, LLC and Tri-County Excelsior Foundation ("TCEF") have also asserted the patent-in-suit in: *Azure Networks, LLC v. MediaTek, Inc.*, 6:12-cv-252-LED (E.D. Tex. Apr. 6, 2012), *Azure Networks, LLC, et al. v. Sony Electronics Inc., et al.*, 6:12-cv-746 (E.D. Tex. Oct. 7, 2012); *Azure Networks, LLC, et al. v. Acer America Corp., et al.*, 6:12-cv-751 (E.D. Tex. Oct. 7, 2012); *Azure Networks, LLC, et al. v. Asus Computer Int'l, et al.*, 6:12-cv-752 (E.D. Tex. Oct. 7, 2012); *Azure Networks, LLC, et al. v. Dell, Inc.*, 6:12-cv-753 (E.D. Tex. Oct. 7, 2012); *Azure Networks, LLC, et al. v. Hewlett-Packard Co.*, 6:12-cv-757 (E.D. Tex. Oct. 7, 2012); *Azure Networks, LLC, et al. v. Intel Corp.*,

6:12-cv-756 (E.D. Tex. Oct. 7, 2012); *Azure Networks, LLC, et al. v. Lenovo (United States) Inc.*, 6:12-cv-748 (E.D. Tex. Oct. 7, 2012); *Azure Networks, LLC, et al. v. Pantech Wireless, Inc., et al.*, 6:12-cv-754 (E.D. Tex. Oct. 7, 2012); *Azure Networks, LLC, et al. v. Samsung Telecommunications America, LLC, et al.*, 6:12-cv-745 (E.D. Tex. Oct. 7, 2012); *Azure Networks, LLC, et al. v. Toshiba America Information Systems, Inc., et al.*, 6:12-cv-755 (E.D. Tex. Oct. 7, 2012); *Azure Networks, LLC, et al. v. Vizio, Inc.*, 6:12-cv-750 (E.D. Tex. Oct. 7, 2012); *Azure Networks, LLC, et al. v. LG Electronics Mobilecomm U.S.A., Inc., et al.*, 6:12-cv-747 (E.D. Tex. Oct. 7, 2012); *Azure Networks, LLC, et al. v. HTC America, Inc., et al.*, 6:12-cv-749 (E.D. Tex. Oct. 7, 2012).

Azure and TCEF have brought two other actions against seventeen defendants, all in the Eastern District of Texas: *Azure Networks, LLC v. Texas Instruments, Inc., et al.*, 6:10-cv-681-LED (E.D. Tex. Dec. 22, 2010); *Azure Networks, LLC v. Alereon, Inc., et al.*, 6:10-cv-686-LED (E.D. Tex. Dec. 23, 2010).

The question of the appropriate level of deference to a district court's claim construction is currently before the *en banc* Court. *See Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 500 F. App'x 951, 951-952 (Fed. Cir. 2013) (granting petition for rehearing *en banc*). In this case, the District Court's construction of the term in dispute in this appeal was correct and should be affirmed under any standard of review.

- 2 -

## STATEMENT OF ISSUES ON APPEAL

1.      Whether TCEF transferred all substantial rights in the patent-in-suit to Azure Networks, LLC, making Azure the sole owner for standing purposes.

2.      Whether the District Court correctly construed the term "MAC Address" to have a meaning unique to the patent-in-suit, specifically "a device identifier generated by the hub device."

## INTRODUCTION

This appeal addresses a patent holding company's effort to stretch the claims of a narrow patent well beyond anything the inventor ever conceived or described—to have it read on the entire Bluetooth wireless communication industry.  It also addresses that company's improper joinder of a local charity as a co-plaintiff in its patent infringement litigation, to try to manipulate venue and avoid taxes.

In June 2010, Appellant Azure Networks, LLC ("Azure") assigned all of its rights and interests in U.S. Patent No. 7,756,129 ("the '129 patent") to Appellant Tri-County Excelsior Foundation ("TCEF"), an off-shoot of a local charity located in the Eastern District of Texas that was specifically created to receive those rights. A few weeks later, in July 2010, TCEF and Azure entered into an agreement transferring all substantial rights back to Azure, but purportedly leaving TCEF as the "owner" of the '129 patent.

- 3 -

Confidential material has been deleted from this page.

Since that time—and just as it had only weeks before—Azure has held the exclusive and fully transferable right to enforce, defend, maintain, and sublicense the '129 patent, without TCEF's permission or advice. Under no circumstances may TCEF license or otherwise encumber the '129 patent. The only rights retained by TCEF are those of a bare licensee, which do not give rise to constitutional standing, {███████████████████████████████████ ████████████████████████████████████ ████████████████████ }. The District Court correctly analyzed Appellants' allocation of rights, finding that Azure holds all substantial rights in the '129 patent, and that TCEF lacks standing because it holds no exclusionary rights.

The District Court also correctly construed the term "MAC Address" by applying the '129 patent's requirements for a "Media Access" address, instead of the conflicting and inconsistent requirements for the distinct industry term "medium access control" address.

The '129 patent resulted from work on a specialized communication project for a "Personal Area Network" called "BodyLAN" that contemplated a hub moving into and out of range of various other devices. Thus, the term "Medium Access" or "MAC" Address as used in the '129 patent is a specialized term used in a specialized way that is at the heart of the alleged invention: a hub device that "orchestrate[] all communications" in the network by creating and assigning a

- 4 -

MAC Address to a peripheral device, and that will not communicate with that peripheral device until the peripheral device has acknowledged the assignment. The '129 patent does not disclose any alternative for assigning peripheral device addresses, and does not describe or enable a network that could operate using generic pre-assigned identifiers not generated by the hub device. On the other hand, the industry generally uses the term "medium access control" address (or "MAC Address") to refer to addresses—such as those used in the accused devices—that are pre-assigned by the manufacturer, not generated by a hub device in a network.

The marked discrepancy between the '129 patent's description of its alleged invention and Appellants' assertion of its claims results from the fact that Azure's president—a patent agent involved with the acquisition of the patent application from its prior owners—added the precursors of the asserted claims and hundreds of others, which required for the first time a "MAC Address," years after the filing of the initial patent application, but only months after the public release of the Bluetooth 3.0+HS standard. The District Court properly rejected the Appellants' attempt to re-write the alleged invention to capitalize on the '129 patent's use of the acronym "MAC," and construed the term "MAC Address" in a manner consistent with the claims, the specification, and the work leading up to the alleged invention.

## STATEMENT OF THE CASE

On March 22, 2011, Appellants Azure and TCEF sued Appellees CSR plc,

Cambridge Silicon Radio International, LLC, Atheros Communications, Inc.,

Broadcom Corporation, Marvell Semiconductor, Inc., Qualcomm Inc., and Ralink

Technology Corporation[1] alleging that Appellees' Bluetooth chips infringe the

'129 patent.  A157-165.  On May 4, 2012, Appellees moved to dismiss TCEF's

claims for lack of standing, arguing that TCEF had assigned Azure all substantial

rights to the '129 patent.  A1189.  On January 16, 2013, the Magistrate Judge

issued a report and recommendation to grant Appellees' motion.  A28.  On March

6, 2013, the District Court adopted the Magistrate Judge's report and

recommendation, dismissing TCEF's claims for lack of standing.  A36.

On December 20, 2012, the Magistrate Judge held a *Markman* hearing.

A2142.  Appellants argued that the term "MAC address" should be construed as

"an address that uniquely identifies a device or group of devices on a shared

communication medium"; Appellees argued that the term should be construed as

"a device identifier created by the hub device."  A8.  On January 16, 2013, the

Magistrate Judge issued a claim construction order, construing certain claim terms

of the '129 patent, including "MAC address."  The Magistrate Judge construed

"MAC address" to mean "a device identifier generated by the hub device."  A12.

---

[1]    Texas Instruments, Inc. was also a defendant, but was subsequently dismissed from the case.

Confidential material has been deleted from this page.

On January 30, 2013, Appellants moved for reconsideration of the construction of "MAC address." A1847. On May 20, 2013, the District Court denied the motion and adopted the Magistrate Judge's construction. A26. On May 28, 2013, Appellants stipulated to a judgment of non-infringement based on the District Court's construction. A2265. On May 30, 2013, the District Court entered final judgment in favor of Appellees. A2.

## STATEMENT OF FACTS

### A.   Background

The '129 patent issued from U.S. Patent Application No. 11/728,246 (the "'246 application"), filed on March 23, 2007. A116. The '246 application was originally assigned to Massachusetts-based BBN Technologies Corp. ("BBN"). A10752-10754. {████████████████████████████████████████████████████████████████████████████████████}. A1019. {████████████████████████████████████████████████████████████████████████████████████████████████}. A360-361; A356; A363; A367; A372. Those four companies collectively have filed over fifty patent infringement suits in the Eastern District of Texas. *See supra* pp.1-2 (Azure), *infra* p.11, n.2 (Stragent); A378-379 (Aloft Media LLC); A381 (Balther Technologies, LLC).

Confidential material has been deleted from this page.



A1033. {⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛} *Id.* {⬛⬛⬛⬛⬛⬛⬛⬛} ... }. A982; A985; A994. {⬛⬛⬛⬛⬛⬛⬛} ... }. A997.

On September 17, 2008, the principals of Stragent formed a new patent-holding company, Azure, purportedly headquartered in the Eastern District of Texas.  A356.  On August 20, 2009, Stragent assigned its rights in the '246 application to Azure.  A547.

Mr. Zilka and another Azure principal, Christopher Edgeworth, then sought local charities to join in their patent enforcement activities and (they apparently believed) to help establish venue in the Eastern District of Texas.  After several organizations rejected their approach, Mr. Zilka and Mr. Edgeworth ultimately convinced CASA of Harrison County to participate.  {⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

Confidential material has been deleted from this page.

███████████████████████████████████████████████████████

███████████████████████████████}.  A10856.  CASA of Harrison

County therefore formed TCEF on June 8, 2010, {████████████████

████████████████}.  A455; A385.  {██████████████████████████████

████████████████████}.  A10870-10871.[2]

The '246 application issued as the '129 patent on July 13, 2010.  A116.  On

July 30, 2010—{██████████████████████████████████████}—

TCEF and Azure entered into an agreement (the "License Agreement"), transferring

back to Azure all substantial rights in the '129 patent, including the exclusive,

---

[2]    In addition to this and the sixteen other suits filed by Azure and TCEF, *see supra* pp. 1-2, Stragent has also been recruiting local non-profits to participate in its Eastern District of Texas cases.  Stragent and either the SeeSaw Foundation or the TAG Foundation—each of which is, like TCEF, a "supporting organization" with no other apparent purpose—have been co-plaintiffs in sixteen patent infringement suits against more than one hundred defendants.  *See Stragent, LLC, et al. v. Amazon.Com, Inc., et al.*, 6:10-cv-225 (E.D. Tex. Apr. 29, 2010); *Stragent, LLC, et al. v. Audi Ag et al.*, 6:10-cv-227 (E.D. Tex. Apr. 29, 2010) and 6:11-cv-361 (E.D. Tex. Jul. 13, 2011); *Stragent, LLC, et al. v. Classmates Online, Inc., et al.*, 6:10-cv-242 (E.D. Tex. May 6, 2010); *Stragent, LLC, et al. v. Freescale Semiconductor, Inc., et al.*, 6:10-cv-91 (Mar. 15, 2010) and 6:10-cv-224 (E.D. Tex. Apr. 29, 2010); *Stragent, LLC, et al. v. HTC Corp. et al.*, 6:10-cv-241 (E.D. Tex. May 6, 2010), *Stragent, LLC, et al. v. Intel Corp.*, 6:11-cv-421 (E.D. Tex. Aug. 10, 2011), *Stragent, LLC, et al. v. LG Elecs. Mobilecomm U.S.A., Inc., et al.*, 6:10-cv-244 (E.D. Tex. May 7, 2010), *Stragent, LLC, et al. v. Match.Com, LLC, et al.*, 6:10-cv-226 (Apr. 29, 2010), *Stragent, LLC, et al. v. Pioneer Electronics (USA) Inc., et al.*, 6:11-cv-278 (E.D. Tex. May 31, 2011), *Stragent, LLC v et al. v. Chrysler Group, LLC*, 6:13-civ-379 (E.D. Tex. May 8, 2013), *Stragent, LLC et al. v. Mercedes-Benz USA, LLC*, 6:13-civ-378 (E.D. Tex. May 8, 2013), *Stragent, LLC v. Hewlett-Packard Co.*, 6:13-civ-610 (E.D. Tex. Aug. 26, 2013), *Stragent, LLC v. Cisco Systems, Inc.*, 6:13-civ-608 (E.D. Tex. Aug. 26, 2013), *Stragent, LLC v. Dell, Inc.*, 6:13-civ-609 (E.D. Tex. Aug. 26, 2013).

worldwide, transferable right to bring enforcement actions, unfettered control over litigation, and exclusive authority to reach settlements and grant sub-licenses. A1201, § 2.1.  TCEF is entitled to 33% of the proceeds from Azure's infringement litigation for the first five years of the License Agreement, and five percent thereafter.  A1202, § 3.1; A1210-11.  TCEF is prohibited from encumbering the '129 patent in any way, and may participate in litigation only at Azure's sole discretion.  A1204-1205, § 4.4.  Nevertheless, TCEF now purports to be the "sole owner" of the '129 patent and a necessary party to this action.  A157; A455.

## B.     The Patent-In-Suit

The '129 patent relates to a "Personal Area Network (PAN)," which is a local network of connected electronic devices in proximity to each other.  A137 ('129 patent 3:10-13).  The '129 patent is a continuation, ultimately from U.S. Application No. 09/535,591, filed March 27, 2000, now U.S. Patent No. 6,804,232. A116.  Each of these patents and applications relates to a project known as "BodyLAN."  A1728.  The specification describes a "star topology" network, in which a single "Hub" communicates with multiple "Personal Electronic Accessory (PEA) devices."  A137, ('129 patent 3:27-30).  As Appellants admit, in the '129 patent, "[t]he hub 'orchestrates all communication in the PAN.'"  Br. 8 (quoting A137 ('129 patent 3:33)).

In the PAN, "[e]ach device is identified by a Media Access (MAC) address." A137 ('129 patent 3:31-32).  As part of its role orchestrating communications, the hub device dynamically assigns Media Access addresses to PEAs, as those devices come onto the network.  "When the Hub 110 receives the attach-request from the PEA, it assigns a MAC address to the PEA [step 1140]."  A141 ('129 patent 11:50-52).

Around the time that Stragent assigned its rights in the '246 application to Azure, Mr. Edgeworth began supervising the prosecution of the '246 application. A10847.  Shortly after the Bluetooth 3.0+HS standard was released on April 21, 2009, Mr. Edgeworth amended the '246 application to add 460 new claims. A10848.  On November 25, 2009, after all 460 new claims were rejected (because they lacked any support in the specification), Azure replaced them with 364 others. A10850.  The Patent Office also rejected these 364 new claims for lack of written description.  A10810.  In response, Azure provided a table purporting to identify "meticulously detailed support for the Claim amendments" in the original specification, and complained that the examiner was not (under Patent Office rules) permitted to reject any of the 364 new claims without responding to this table line-by-line.  A10812.  Many of the citations in that table pointed to portions of the specification with little apparent relationship to the claims for which they supposedly provided support.  *Compare* A10763, A10813 (claim 503) *with*

- 11 -

A10838, A10840 (paragraphs [0037], [0062]). Nevertheless, the examiner did not attempt to go through the exercise of responding to Azure's citations, and instead allowed the claims without analysis or substantive comment. A1778.

On March 22, 2011, Azure and TCEF asserted 58 of those new claims against nine defendants on the basis of the defendants' products' purported compliance with the Bluetooth 3.0+HS and 4.0+HS standards.

## SUMMARY OF THE ARGUMENT

The District Court correctly dismissed TCEF for lack of standing, and correctly construed "MAC address" as "a device identifier generated by the hub device."

TCEF has no substantial rights in the '129 patent, as the District Court correctly determined. Appellants do not—because they cannot—dispute that the vast majority of the factors that this Court has identified as relevant in determining whether a party has standing—including the factor this Court has identified as most important —show that Azure is the owner of the '129 patent. Azure holds the exclusive and fully transferable right to enforce, defend, maintain, and sublicense the '129 patent, but TCEF holds only a non-exclusive, non-transferable right to practice the alleged invention and a share in Azure's litigation proceeds. This allocation of rights is consistent with the intent of Azure and TCEF, as found by the District Court, to allow Azure to retain complete and total control over the

'129 patent (but otherwise to use TCEF's purported "ownership" to manipulate venue and to reduce Azure's taxes). The rights retained by TCEF, however, are insufficient to confer standing under this Court's well-established precedent.

The District Court's construction of "MAC address" as "a device identifier generated by the hub device" accurately reflects the use of the term in the claims, specification, and background of the '129 patent. Without exception, the patent uses "MAC address" to refer to addresses generated by the hub device. In challenging this construction, Appellants rely on three incorrect premises: that the specification's definition of the claim term can be ignored (it cannot); that the District Court improperly imported a limitation from the specification (it did not); and that the '129 patent's use of the term is consistent with Appellants' proffered ordinary meaning (it is not). Appellants' attacks on the District Court's construction are baseless, and this Court should affirm.

## ARGUMENT

## I.    STANDARD OF REVIEW

This Court reviews *de novo* district court decisions regarding standing to sue. *Rite-Hite Corp. v. Kelly Co.*, 56 F.3d 1538, 1551 (Fed. Cir. 1995) (*en banc*).

This Court "review[s] claim construction *de novo* on appeal including any allegedly fact-based questions relating to claim construction." *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998). The question of the appropriate

level of deference to a district court's claim construction is currently before the *en banc* Court. *See Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 500 F. App'x 951, 951-952 (Fed. Cir. 2013) (granting petition for rehearing *en banc*). In the present case, the District Court's construction was correct and should be affirmed under any standard of review.

## II. THE DISTRICT COURT CORRECTLY FOUND THAT TCEF TRANSFERRED ALL SUBSTANTIAL RIGHTS TO AZURE

In assessing whether a party to a patent license agreement has standing to sue for infringement, this Court examines the specific rights transferred and the intent of the parties to the transfer. *See Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1343 (Fed. Cir. 2001); *see also Sicom Sys., Ltd. v. Agilent Tech., Inc.*, 427 F.3d 971, 976 (Fed. Cir. 2005) ("Each license and assignment is unique, therefore this court 'must ascertain the intention of the parties and examine the substance of what [the license agreement] granted[.]'") (alterations in original) (quoting *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1377 (Fed. Cir. 2000)).

"When a party holds all rights or all substantial rights, it ***alone*** has standing to sue for infringement." *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1340 (Fed. Cir. 2007) (emphasis added). A grant of "'all substantial rights' to [a] patent … amounts to an assignment or a transfer of title, which confers constitutional standing on the assignee," who becomes functionally the owner of the patent. *Id.*

- 14 -

(footnote omitted).  Conversely, when a party holds neither all substantial rights nor an exclusive license, the party has no constitutional standing, even to be joined in a suit with the actual owner of the patent.  *See id.* at 1340-1341; *see also Alfred E. Mann Found. for Sci. Research v. Cochlear Corp.*, 604 F.3d 1354, 1360 (Fed. Cir. 2010) ("[T]he question is whether the license agreement transferred sufficient rights to the exclusive licensee to make the licensee the owner of the patents in question.  If so, the licensee may sue ***but the licensor may not***." (emphasis added)).

The terms of the License Agreement demonstrate the parties' intent for TCEF to transfer all substantial rights to Azure.  Appellants admit that there are "many rights allocated to Azure," but faults the District Court for "focusing" on only enforcement and licensing rights.  Br. 21-22.[3]

### A.   Azure Holds The Most Important Right: The Exclusive Right To Enforce The '129 Patent

The nature and scope of TCEF's retained right to sue accused infringers is "the most important factor" in determining whether the License Agreement transferred sufficient rights to render Azure the owner of the '129 patent for standing purposes.  *Mann*, 604 F.3d at 1361.  The "nature and scope" of TCEF's purported right to sue accused infringers is easily defined—it is non-existent.

---

[3]    Appellants also argue that an examination of the other factors this Court has deemed relevant demonstrates TCEF did not transfer all substantial rights.  Br. 22-23 (citing factors listed in *Mann*, 604 F.3d at 1360-1361).  Appellants fail to address several of these factors, however, presumably because they reveal TCEF's lack of standing.  *See infra* Part II.B.

Section 4.4 of the License Agreement grants Azure the "exclusive right to enforce and defend" the '129 patent.  A1204.  There is no ambiguity as to the parties' intentions.  Rather, the very next sentence of the License Agreement makes clear that the intent of the transfer was to effectively confer ownership on Azure: "[t]o the extent the foregoing sentence is not considered enforceable"—*i.e.*, if the parties somehow failed to transfer the "exclusive right to enforce or defend" the '129 patent to Azure—"TCEF hereby further assigns, transfers and conveys to Azure all right, title and interest it has in and to all claims, causes of action and enforcement rights, whether currently pending, filed, or otherwise, under the ['129 patent]."  *Id*.

TCEF transferred the "exclusive right to enforce and defend" the '129 patent to Azure.  It retained no right whatsoever to participate in Azure's infringement suits, and no say whatsoever in how they are settled.  A1204-1205.  Azure's right to enforce the '129 patent is also fully transferable, with no permission necessary from TCEF.  A1201, § 2.1.  This right is "particularly dispositive" of Azure's rights as compared to TCEF's.  *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 875 (Fed. Cir. 1991) (holding "all substantial rights" transferred when licensee granted total control over right to sue for "past, current, and future" infringement); *see also Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1251 (Fed. Cir. 2000) (holding "all substantial rights" transferred when licensor had no control over litigation decisions and also no right to veto any transfer of the

licensee's rights).  Moreover, Appellants' intentions regarding this right cannot be disputed.  *See* A1201, § 1.2 (TCEF and Azure both "wish" to grant Azure the "full right to enforce and/or sublicense the ['129 patent]").  Therefore, the factor considered most important by this Court weighs heavily against TCEF's standing.

## B.    Other Factors Relevant To Standing Demonstrate That Azure Owns All Substantial Rights

Several of the rights admitted to be relevant and then ignored by Appellants[4] likewise confirm that the District Court was correct to conclude that TCEF lacks standing.  ***First,*** Azure's right to sublicense is unlimited.  *See Mann*, 604 F.3d at 1360; *Morrow*, 499 F.3d at 1342 ("[T]he right to license third parties is an important patent right because implicit in the right to exclude is the right to waive that right; that is, to license activities that would otherwise be excluded.").  In particular, § 2.1 provides Azure the "full right" to sublicense the '129 patent "without any restriction."  A1201.  Furthermore, Section 1.2 explicitly defines the parties' "wish" in this regard, while § 4.4 ensures that TCEF has "no right to and shall not grant any license … or otherwise encumber [the '129 patent] in any manner."  *Id.*; A1204.

***Second***, as Appellants admit, § 2.1 provides Azure "a worldwide, transferable, exclusive license" to make, use, sell, offer to sell, import, lease and

---

[4]    *See* Br. 22-23 (acknowledging the relevance of Azure's right to sublicense; Azure's right to practice the '129 patent; TCEF's obligation to pay maintenance fees; the scope of Azure's right to assign its rights in the '129 patent; and TCEF's ability to supervise or control Azure's activities).

"otherwise practice any invention in any manner." Br. 12 (citing A1201, § 2.1). The exclusive right to make, use, and sell products under the '129 patent is a right considered "vitally important" by this Court. *Mann*, 604 F.3d at 1360 (citing *Propat Int'l Corp. v. RPost, Inc.*, 473 F.3d 1187, 1193-1194 (Fed. Cir. 2007)).

*Third,* TCEF has no right, let alone an obligation, to continue paying patent maintenance fees. A1201; *see Mann*, 604 F.3d at 1361; *Propat*, 473 F.3d at 1191 (concluding that obligation to maintain a patent is an indication of an ownership interest in the patent). Section 2.2 grants *Azure* "the exclusive right, but not the obligation, to control and/or cause filing(s), prosecution, and/or maintenance in connection with [the '129 Patent] and any and all … continuations, reissues, reexaminations, renewals … and/or extensions thereof." A1201.

*Fourth,* Azure's worldwide, exclusive right to enforce, defend, practice, and sublicense the '129 patent is fully transferable. A1201; *see Mann*, 604 F.3d at 1361; *Sicom*, 427 F.3d at 979 ("[J]ust as the right to alienate personal property is an essential indicia of ownership, the right to further assign patent rights is implicit in any true assignment.") (citation omitted).

*Fifth*, TCEF's supervisory rights are completely nonexistent. *See Mann*, 604 F.3d at 1361. Section 4.4 provides that "[a]s between Azure and TCEF, Azure will have the exclusive right, but not the obligation, to maintain, enforce, or defend" the '129 patent. A1204. Even when joined as a plaintiff, TCEF has no

- 18 -

Confidential material has been deleted from this page.

supervision or control rights; rather, Azure maintains "full and absolute control" of

the litigation, including any settlement.  A1205.

Appellants do not, because they cannot, argue that any of these factors weigh

in favor of TCEF's standing.  The District Court therefore correctly found that the

"overwhelming weight of the factors, including the most important factor noted by

[this Court], suggests that Azure is the owner of the '129 Patent."  A0034.[5]

### C. Appellants' Intent To Transfer Full Control To Azure Cannot Be Squared With Their Belated Attempt To Claim TCEF Retained Substantial Rights

Caught between their desire to transfer full control of the '129 patent to

Azure on the one hand and the ability to use TCEF to their benefit on the other,

Appellants now assert that the License Agreement does not transfer all substantial

---

[5]     Other than denying that they intended to transfer all substantial rights to
Azure, nowhere in Appellants' brief do they even attempt to explain their
donation/license scheme's true purpose. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ }
A8980; A8990.  In addition, throughout this litigation, Appellants have repeatedly
relied on TCEF and even CASA as reasons to resist transfer from its ▮▮▮▮▮
▮▮▮ } district, citing (i) TCEF's "three directors"; (ii) CASA's "three full-time
employees, one part-time employee," and "35 volunteers"; (iii) TCEF's tax
attorney {▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ }; and (iv) persons that
TCEF may or may not have negotiated with, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮ } A8980-8981; A8990.  This is presumably what Appellants intended by
giving full control of any enforcement proceedings to Azure, including the "sole
discretion" to determine that TCEF's participation is "desirable to address a legal
issue"—such as venue.  A1204-1205.  Thus, beyond the Agreement's clear
allocation of all substantial rights to Azure, Appellants' actions in effectuating
those rights demonstrate their intent—to pin venue in the Eastern District of Texas,
and also to deduct both the value of its June 10, 2010 "donation" to TCEF and
portions of litigation proceeds owed to TCEF from Azure's tax liability.

- 19 -

rights to Azure. However, none of the rights retained by TCEF negates the correct

conclusion that Azure alone has standing. *See Morrow*, 499 F.3d at 1341 n.8

("While parties are free to assign some or all patent rights as they see fit based on

their interests and objectives, this does not mean that the chosen method of

division will satisfy standing requirements.").

　　*First,* as the District Court correctly held, TCEF's reversionary interest is

not a substantial right under *Prima Tek II*. A34. In *Prima Tek II*, this Court

considered a license with "a termination clause whereby the license automatically

terminated at the end of an initial … term, or at the end of each year thereafter,

unless [the licensor] notified [the licensee] at least 30 days in advance of its intent

to renew the agreement for an additional year." 222 F.3d at 1374. The termination

clause in *Prima Tek II* is nearly identical to that in the license here, which provides

that its term "shall end … on the termination date of 03/27/2018 or at the end of

each year thereafter, unless TCEF [*i.e.*, the licensor] notifies Azure [*i.e.*, the

licensee] at least 30 days in advance of its intent to renew the agreement for an

additional year." A1207. Like the termination clause in *Prima Tek II*, TCEF's is

"entirely consistent with an assignment." 222 F.3d at 1378 (quoting *Vaupel*, 944

F.2d at 874-875, and citing *Waterman v. Mackenzie*, 138 U.S. 252, 256 (1891));

*see also id.* at 1379 ("[N]either the termination clause nor the renewal cycle of the

license agreement … require[s] [the licensor] to be joined").

Appellants argue that *Prima Tek II* "should not guide this Court's analysis." Br. 31. However, Appellants cannot dispute that the renewal clause in the License Agreement is virtually identical to the one that this Court found in *Prima Tek II* did ***not*** require joinder for standing purposes. Nor has the Court since "disregarded" *Prima Tek II's* language, as Appellants urge it to do here. *See Id.* at 32. In *Aspex Eyewear*, the Court specifically distinguished license agreements with a "hard" termination date—which are inconsistent with a transfer of all substantial rights— from those with a renewal cycle that are expected to last for the life of the patent. *Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336, 1343 (Fed. Cir. 2006) (explaining that it is "presumable that the transferred patent [will] never return to the assignor" because "the term of the agreement exist[s] potentially for the life of the [patent]").[6]

Appellants claim the Court "disregarded" *Prima Tek II* in *Propat*. Br. 32. But the Court did not discuss—let alone refuse to follow—*Prima Tek II* in *Propat*. Rather, in *Propat*, the Court found an agreement did not transfer all substantial rights where the licensor retained, *inter alia*: (1) the responsibility to maintain the asserted patent, (2) the right to veto licensing and litigation decisions, (3) the "particularly significant" right to veto any transfer of the licensee's rights, and (4)

---

[6]    *See also Prima Tek II*, 222 F.3d at 1378 (distinguishing for the same reason *Moore U.S.A., Inc. v. Standard Register Co.*, 60 F. Supp. 2d 104, 109-110 (W.D.N.Y. 1999), cited by Appellants at Br. 30 n.7).

the right to terminate the agreement if the licensee failed to meet specified benchmarks, which the Court found indicative of ownership. 473 F.3d at 1191-1192. TCEF holds none of these rights. *See supra* Part II.A-B.

*Second*, Appellants maintain that TCEF's right to terminate the License Agreement under certain conditions demonstrates its ownership. Br. 27. But if Azure chooses not to pay the maintenance fees for the patent—a right which it alone holds—the patent term ends. 35 U.S.C. § 41(b)(2). As a result, Azure has the right to determine whether or not the patent term will have expired by 2018—and thus whether or not TCEF's reversionary interest will ever arise. Azure's exclusive power to determine how long the life of the patent will be, including whether the patent will expire during the term of the License Agreement, demonstrates assignment and ownership. *See Mann*, 604 F.3d at 1361. Moreover, in the event the License Agreement is terminated by either party for any reason, "all rights conveyed or licenses granted by Azure [to the '129 patent] will survive." A1207-1208. As stated *supra*, Azure's exclusive rights to enforce, defend, maintain, and sublicense the '129 patent is fully transferable. A1201. Because Azure may transfer those rights before termination, TCEF's "termination" rights are illusory at best. *See Speedplay*, 211 F.3d at 1251 (finding licensor's right to sue rendered illusory by licensee's ability to grant royalty-free licenses to licensor-accused infringers).

Confidential material has been deleted from this page.

Appellants also argue that TCEF's retention of an ownership interest is shown by the provision allowing Azure to acquire all right, title and interest in the '129 patent for $305,000 if TCEF terminates the License Agreement because the parties' donation/license back scheme endangers TCEF's tax-exempt status.  Br. 23 (citing A1207).  In that event, however, Azure may offset against that price any payments previously made to TCEF under the License Agreement ███████████████ ███████████████}.  A1208.  Therefore, even if TCEF tries to terminate the License Agreement, it is powerless to stop Azure from simply exercising its option to acquire TCEF's interest, without any additional compensation.

**Third,** Appellants argue that TCEF's right to receive 33% of the initial proceeds from litigation deprives Azure of all substantial rights.[7]  That is not the law.  *See Propat*, 473 F.3d at 1191 ("[T]he fact that a patent owner has retained a right to a portion of the proceeds of the commercial exploitation of the patent … does not necessarily defeat what would otherwise be a transfer of all substantial rights in the patent."); *Vaupel*, 944 F.2d at 875 ("[T]he right to receive infringement damages was merely a means of compensation under the agreement; this was not inconsistent with an assignment.").

**Fourth,** TCEF's non-exclusive, non-transferable right to practice the alleged invention internally and to make or sell "TCEF-branded" products is not a

---

[7]     TCEF's share of the profits drops to five percent in 2015.  A1202.

Confidential material has been deleted from this page.

"substantial" right. *See* Br. 26. As an initial matter, neither Azure nor TCEF

makes or sells any products. A8976-8981. TCEF is a non-profit organization

created specifically for the purposes of accepting Azure's "donation" on behalf of

another non-profit. A455. { ███████████████████████████████

████████████████████████████████████████████████████████

███████████ } A1235.

But in any event, because without at least some exclusivity rights there can

be no legal injury from infringement, the holder of a nonexclusive right to practice

an invention—such as TCEF—has no constitutional standing even to *join* an

infringement suit. *See Sicom*, 427 F.3d at 976; *see also WiAV Solutions LLC v.

Motorola, Inc.*, 631 F.3d 1257, 1265 (Fed. Cir. 2010) ("[T]he touchstone of

constitutional standing in a patent infringement suit is whether a party can establish

that is has an exclusionary right in a patent that, if violated by another, would cause

the party holding the exclusionary right to suffer legal injury."). TCEF lacks *any*

exclusionary rights in the '129 Patent under the License Agreement; in fact, the

License Agreement specifically *denies* TCEF the right to encumber the '129 patent

in any way. A1204. Without the right to sublicense—that is, to waive one's

exclusionary rights—a party has no exclusionary rights. *See Morrow*, 499 F.3d at

1342. Because TCEF lacks exclusionary rights, any alleged infringement by

Appellees can cause TCEF no legal injury, and it therefore lacks standing to pursue

Confidential material has been deleted from this page.

this action—even joined with Azure as a party. *See id.* at 1343 ("To demonstrate

entitlement to join as a *co-plaintiff* [a party] must have the right to exclude others

from making, using or selling the invention in the United States.").



}. A982; A985; A994;

A997. {

} (*see* A1201; A1202;

}. Br. 24-25.

For these reasons, the Court should affirm the District Court's dismissal of

TCEF for lack of standing.

## III.  THE DISTRICT COURT CORRECTLY CONSTRUED "MAC ADDRESS"

The District Court was correct to conclude that the '129 patent uses the term

"MAC address" to mean "Media Access address" in a way different from the

industry use of "MAC address" to mean "medium access control address."

Specifically, the District Court properly gave special consideration to the

specification of the '129 patent. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1316

(Fed. Cir. 2005) (*en banc*) (explaining that "the specification may reveal a special

definition given to a claim term by the patentee that differs from the meaning it

would otherwise possess") (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d

1359, 1366 (Fed. Cir. 2002)). "In such cases, the inventor's lexicography

governs." *Id.*

### A.    "MAC Address" Is Defined In The '129 Patent As A "Media Access" Address, Which Is Generated By The Hub Device

#### 1.    In the '129 patent, "MAC address" means "Media Access address"

The specification of the '129 patent explicitly defines "MAC address" as

"Media Access address." A137 ('129 patent 3:31-32) ("Each device is identified

by a ***Media Access (MAC) address***."[8] (emphasis added). "[T]erms coined by the

inventor"—here, "Media Access address"—"are best understood by reference to

the specification." *Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282, 1287 (Fed. Cir.

2010) (citing *Phillips*, 415 F.3d at 1315). And, where "the specification reveals 'a

---

[8]    Inventors who use parentheses to define claim terms act as their own lexicographers, just as if they had included quotation marks or used the word "defined." *See, e.g.*, *Intel Corp. v. Broadcom Corp.*, 172 F. Supp. 2d 478, 495-96 (D. Del. 2001) (concluding that "by linking [claim] terms to phrases in parentheses," the "inventors were their own lexicographers").

special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess[,] … the inventor's lexicography governs.'" *SkinMedica, Inc. v. Histogen Inc.*, --- F.3d ---, 2013 WL 4487603, at *7 (Fed. Cir. Aug. 23, 2013) (quoting *Phillips*, 415 F.3d at 1316) (alterations in original).

Appellants admit that as used in the '129 patent, "MAC" stands for "Media Access." Br. 45 (quoting A137 ('129 patent 3:31-32)). And Appellants also admit that—outside the context of the '129 patent—the "MAC" in "MAC address" is "normally expanded" to "Medium Access *Control*," not to "Media Access." Br. 45 (emphasis added).

The use of the acronym "MAC" in the '129 patent is thus unique, reflecting the distinction between pre-programmed identifiers, as "media [or medium] access control addresses" are generally understood, *see infra* Part III.B n.14, and the dynamic identifiers described in the '129 patent, *see infra* Part III.B. In the former case, each device's "medium access control" address is a fixed "control" number for the device. In the '129 patent, on the other hand, "Media Access" addresses are dynamic and frequently reassigned, so they do not act as permanent "control" numbers for individual devices and the concept of "control" is not included in its acronym.

Appellants assert that "[o]ther technical literature expands 'MAC address' as 'Media Access address.'" Br. 45 n.12. Appellants cited these documents below to

argue (for the first time, in their objections to the Magistrate Judge's Report and Recommendation Construing Terms of the '129 Patent), that the inventor's term "Media Access" would have been understood in the industry as synonymous with "medium access control." A1856-1857. But one of these references is undated and unsourced (A1978), and the other is dated well after the priority date of the '129 patent and relates to an apparently proprietary product (A1974). As presented below, Appellants also included a third document in this set, a 2004 publication entitled "The Hacker's Handbook: The Strategy behind Breaking into and Defending Networks." A1968. Appellants offer no reason whatsoever to think that any of these documents shed any light on the common industry understanding of anything, let alone the meaning of the term "MAC address" in 2000. To the contrary, the fact that Appellants could uncover only these fringe uses demonstrates that the term "Media Access" is not synonymous with the industry term "medium [or media] access control."

Appellants further contend that "dropping one word" (*i.e.*, "control") is insufficient to "redefine" a term (Br. 45-46), but they cite no authority for the proposition that an inventor is not entitled to use an acronym in whatever way the inventor chooses, and no authority for the proposition that the District Court may disregard the express language of the specification. *See Phillips*, 415 F.3d at 1316 ("[T]he specification may reveal a special definition given to a claim term by the

patentee that differs from the meaning it would otherwise possess"); *Sun Pharm. Indus., Ltd. v. Eli Lilly & Co.*, 611 F.3d 1381, 1388 (Fed. Cir. 2010) ("[C]laim terms must be construed in light of the entirety of the patent, including its specification.").

Any doubt that the "Media Access" address in the '129 patent was intended to be different from the industry "medium access control" address is resolved by the inventor's own documents.[9]  According to Appellants, the '129 patent was developed "in the course of [the inventor's] work on a project known as BodyLAN."  Br. 6.  The "BodyLAN Personal Area Network Technology Digital Control Chip Development Specification"—one of the documents that Appellants admitted shows the conception and reduction to practice of the alleged invention— makes clear that "MAC" is the abbreviation for "Media Access," not "medium [or media] access control."  Six times, the BodyLAN specification uses the phrase "Media ACcess," capitalizing the "A" and the first "C" in "ACcess," demonstrating that the "C" in "MAC" refers to the second letter in "ACcess," not

---

[9]    Appellants argued to the District Court that the inventor's documents "embody many of the hallmark attributes set forth … in *Phillips* that underlie the rationale for ascribing extrinsic evidence a limited role" in claim construction. A2239.  Appellants were and are incorrect; these BodyLAN documents preceded rather than postdated the prosecution of the '129 patent; they were written by a skilled artisan (*i.e.*, the inventor); and they were not created for litigation.  Reliance on such materials is proper.  *See, e.g.*, *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1355 (Fed. Cir. 2001) (approving of the district court's reliance on inventor's statements to construe claim term).

- 29 -

Confidential material has been deleted from this page.

to "control."  A1664; A1686; A1691; A1701.  And consistent with the patent

specification, the BodyLAN specification makes clear that the "Media ACcess"

number originates from the hub device.  A1701.  Accordingly, the current

president of Appellant Azure—the person who drafted the first claims of the

underlying application to include the term "MAC address" many years after the

specification was written but a short time after the publication of the Bluetooth

standard accused of infringement— {█████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████ } A2103.

### 2.    The hub device generates the "MAC address"

The specification of the '129 patent consistently attributes the creation and

assignment of MAC addresses to the hub device.  The '129 patent does not

describe or enable any way to create the claimed network without an address

generated by the hub device.  For example, the Summary of the Invention

describes a single method of device attachment relating to the hub device, and that

method includes the step of the hub device "generating a new address to identify

the unattached peripheral device in response to the received attach request."  A136

('129 patent, 1:63-2:6).  The aspects of the Summary of the Invention dealing with

peripheral devices include similar language.  *See id.*, 1:56-61 ("[t]he unattached

peripheral device … receives a new address from the hub device . . ., and

communicates with the hub device using the new address"); *id.*, 2:8-14 (the

unattached peripheral device "receiv[es] a new address from the hub device" and

"attach[es] to the network using the new address").  The specification's discussion

of the hub-peripheral device attachment process confirms that the MAC addresses

originate with the hub device:

- "The Hub 110 then assigns a MAC address to the PEA[10] 120."  A141 ('129 patent 11:2-4).

- "When the Hub 110 successfully receives the attach-request from the PEA, it assigns a MAC address to the PEA [step 1140]."  *Id.*, 11:50-54.

- "The Hub 110 sends the *new* MAC address 610 in an attach-assignment message to the now-identified PEA 120."  *Id.*, 11:55-60 (emphasis added).

- "The PEA 120 waits for an attach confirmation from the Hub 110 using the *new* MAC address [step 1260] and, upon receiving it, sends a final acknowledgement to the Hub 110 [step 1270]."  *Id.*, 12:31-34 (emphasis added).

Likewise, the only figures in the '129 patent that deal with device

attachment processing, A136 ('129 patent, 2:52:54), demonstrate that the hub

device generates the MAC addresses that identify peripheral devices:

---

[10]    In the '129 patent, peripheral devices are often referred to as Personal Electronic Accessories, or PEAs.  A137 ('129 patent, 3:26-32) (describing Fig. 1).

 

A133-34 ('129 patent, Figs. 11-12 (emphasis added)).

The specification's description of the software architecture also refers to one

and only one source for MAC addresses:

> The LLC [*i.e.*, link layer control] 420 provides attachment support by
> providing attachment opportunities for unattached PEAs to attach to
> the Hub 110 so that they can communicate, ***providing MAC address
> assignment***, and initializing an NI [*i.e.*, network interface] 430 and the
> layers below it for communication with a PEA 120.

A138 ('129 patent 5:30-34) (emphasis added).

> The LLT [*i.e.*, link layer transport] 440 maps the PEA identifier to ***the
> MAC address assigned to the PEA 120 by the Hub 110***.

*Id*. ('129 patent 6:54-67) (emphasis added).

The disclosed software architecture is thus consistent with the rest of the

specification, in that there is one and only one source of MAC addresses—the hub

device.  The District Court recognized as much, agreeing "with the Magistrate

- 32 -

Judge's finding that what is defined and consistently disclosed is a MAC address that originates with the hub device."  A26.

The District Court's conclusion is correct, and its reasoning is faithful to this Court's emphasis on "understand[ing] the claim term 'after reading the entire patent.'"  *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1375 (Fed. Cir. 2009) (quoting *Phillips*, 415 F.3d at 1321); *see id.* (explaining that the claimed "spike" must be pointed because "[t]he specification never suggests that the spike can be anything other than pointed").  In *Retractable Techs. v. Becton, Dickinson & Co.*, for example, the Court determined that the District Court erred in construing "body" to encompass "bodies composed of multiple pieces," because, among other things, "each figure that depicts a syringe shows a one-piece body."  653 F.3d 1296, 1305 (Fed. Cir. 2011).  Similarly, in *Kinetic Concepts, Inc. v. Blue Sky Med. Grp., Inc.*, the Court considered the proper construction of the term "wound."  554 F.3d 1010, 1019 (Fed. Cir. 2009).  Because "[a]ll of the examples described in the specification involve skin wounds," the Court concluded that "[t]o construe 'wound' to include fistulae and 'pus pockets' would … expand the scope of the claims far beyond anything described in the specification."  *Id.*; *see also Saffran v. Johnson & Johnson*, 712 F.3d 549, 560 (Fed. Cir. 2013) (construing "device" so as to "accord with *every* embodiment and description presented in the '760 patent"); *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1317 (Fed. Cir. 2005) (affirming construction

- 33 -

of "region of interest" as "as referring to the 'portion of the body being scanned'" based in part on examples in the specification that "strongly point to the 'region of interest' as being the portion of the anatomy being imaged"); *Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1300-1301 (Fed. Cir. 1999) (rejecting construction that "includes the restriction ring whether or not the ring is attached to the cover," because "[n]owhere in the specification, including its twenty-one drawings, is the cover shown without the restriction ring attached to it"); *Wang Labs., Inc. v. America Online, Inc.*, 197 F.3d 1377, 1383 (Fed. Cir. 1999) ("The only embodiment described in the '669 patent specification is the character-based protocol, and the claims were correctly interpreted as limited thereto.").

Appellants complain that "the patentee never announced what MAC address means"[11] and that, because the "specification continually emphasizes that it is disclosing 'exemplary' embodiments," the '129 patent contains no "implicit redefinition" of MAC address.  Br. 46-47.  Thus, Appellants argue that the District Court's construction of "MAC address" is not premised, as the District Court stated, on the fact that "[t]he specification of the '129 Patent consistently describes a MAC address assigned and generated by the hub device in accordance with the

---

[11]     Appellants' assertion that the '129 patent contains no "definition of MAC address" is curious, given that they do not dispute that "MAC address" is used as shorthand for "Media Access address."  Br. 45-46.  Presumably, what Appellants mean is that the '129 patent does not further expressly define "Media Access address."

disclosed invention, a PAN wherein all communication is orchestrated by the Hub." A137. Rather, Appellants contend, the construction results from the District Court "committing 'one of the cardinal sins of patent law—reading a limitation from the written description into the claims.'" Br. 49 (quoting *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001)).

Appellants are incorrect. The "written description can provide guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to be construed, even if the guidance is not provided in explicit definitional format." *SciMed*, 242 F.3d at 1344; *see also Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001) ("[T]he specification may define claim terms 'by implication' such that the meaning may be 'found in or ascertained by a reading of the patent documents.'") (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1578 n.6 (Fed. Cir. 1996)).

Appellants' reliance on *SciMed* is misplaced—the portion that Appellants quote actually describes the appellant's argument, which the Court rejected. 242 F.3d at 1340 ("SciMed argues at length that … the district court has committed one of the cardinal sins of patent law. … But that is not an accurate characterization of what the district court did."). In fact, the *SciMed* court affirmed the district court's construction based largely on the specification:

- 35 -

> At various points, the common specification of the three patents indicates that the claimed invention uses coaxial, rather than side-by-side lumens … . Read together, these portions of the common specification lead to the inescapable conclusion that the references in the asserted claims to an inflation lumen "separate from" the guide wire lumen must be understood as referring to coaxial lumens[.]

*Id.* at 1342.

*SciMed* is not unusual, as the Court has warned against constructions that fail to "tether the claims to what the specification[] indicate[s] the inventor actually invented." *Retractable Techs.*, 653 F.3d at 1305; *see also Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1342 (Fed. Cir. 2010) (rejecting proposed construction that would encompass "direct detection," in part because the specification "contains no disclosure whatsoever of direct detection"). Accordingly, where—as here—the specification discloses only one implementation, the construction must reflect that implementation. *See Wang Labs.*, 197 F.3d at 1383 ("The usage 'preferred' does not of itself broaden the claims beyond their support in the specification."); *Saffran*, 712 F.3d at 560 ("Extensive, consistent usage in the specification therefore suggests that the claimed 'device' should be understood as a sheet[.]"); *Kinetic Concepts*, 554 F.3d at 1019 (construing "wound" to reflect the fact that "[a]ll of the examples described in the specification involve skin wounds" so as not to "expand the scope of the claims far beyond anything described in the specification").

Rather than identifying any instance in which the specification departs from hub-generated MAC addresses,[12] Appellants suggest that claim 50 necessitates a broader construction. Br. at 44 (arguing that "some claims specifically describe that the MAC addresses are assigned by the local network," whereas "other claims … do not specify how the MAC addresses are generated in the first instance"). But claim 50 does not relate to the sources of MAC addresses; instead, claim 50 is directed to "responsibilities" within the hub's software architecture's "several distinct layers." A138 ('129 patent 5:9-22); *see also* A122 ('129 patent Fig. 4):

> 50. The hub device according to claim 48, wherein **the link layer is responsible** for assignment of the plurality of MAC addresses.

A143 ('129 patent claim 50) (emphasis added).

The District Court recognized exactly this distinction. A12 ("Claim 50 … simply requires that the link layer, in particular, is responsible for the assignment of the plurality of MAC addresses."). Like the written description, the claims provide no reason to conclude anything other than that MAC addresses are always generated by hub devices in the '129 patent.

---

[12]    Appellants note that the specification refers to "attach MAC ('AMAC') address." Br. at 11. Appellants argued to the District Court that "limiting MAC addresses to hub-assigned identifiers would exclude embodiments employing" AMACs. A1786. But as the District Court observed, "self-selection" of AMACs "occurs only among what is made available by the hub." A11-12 (citing A141 ('129 patent 11:33-34, 11:37-38)).

**B.    The District Court Correctly Concluded That The '129 Patent Does Not Use "MAC Address" According To What Appellants Claim To Be The Term's Ordinary Meaning**

Because the hub device "orchestrates all communications" in the network, A137 ('129 patent 3:33-35), it must be configured to create and assign the MAC addresses that it uses for attachment and communications purposes. The only embodiment disclosed in the '129 patent for enabling the hub device to effect such control is for the hub to create and assign MAC addresses. *See supra* Part III.A.2. In particular, the patent describes that (1) the hub creates a MAC address and assigns it to a peripheral; (2) the hub waits for the peripheral to acknowledge that assignment; and (3) only after receiving that acknowledgment does the hub use the MAC address it assigned to communicate with and learn the state of the peripheral. *Id.* The '129 patent does not describe any other way for the hub device to perform the attachment and communication steps required by the claims. By contending that "MAC address" refers to an unspecified and potentially proprietary identifier, Appellants disavow these critical steps. Without these steps, however, there can be no communication, and therefore no network.

Furthermore, contrary to Appellants' repeated assertions that, according to their ordinary meaning, MAC addresses "uniquely identify the physical devices on the network," Br. 40; *see also* Br. 41 (arguing that "the prior art discloses that MAC addresses may be used as unique addresses to identify the specific physical

- 38 -

network device"), the MAC addresses generated by the hub device in the '129 patent are not unique to PEAs.[13]  This is true in three distinct ways.  ***First***, the hub device can assign multiple different MAC addresses to individual PEAs.  A140 ('129 patent 9:24-25) ("the PEA 120 supports more than one MAC address 610").  ***Second***, when a PEA leaves a network, it loses its assigned MAC address, and the hub can assign that same MAC address to a different PEA.  A141 ('129 patent 11:14-16 ("This MAC address remains assigned to that PEA … for the duration of the time that the PEA … is attached.").  ***Third***, the hub can modify a PEA's MAC address.  *Id.*, 11:55-65 ("The Hub … sends the new MAC address" and then confirms "that the PEA … has switched to its new MAC [address]").

Appellants also point to an IEEE specification as providing an alternative definition of "MAC address" to include assignment "either universally at the time of the device's manufacture or locally by the network."  Br. 40-41 (citing and quoting A1604-1607).  This is irrelevant, for several reasons.

***First***, there is no indication in the specification or otherwise that this alternative meaning of "MAC address" would be the one applied by a person of ordinary skill in the art.  *See Phillips*, 415 F.3d at 1313.  In fact, in their opening claim construction brief, Appellants cited and quoted two references that make

---

[13]    That MAC addresses in the '129 patent are not unique to peripheral devices is consistent with the inventor's use of "media"—plural—rather than "medium," as is commonly used for fixed, device-specific identifiers.

clear that one of ordinary skill would understand MAC addresses as pre-

programmed identifiers, not locally assigned addresses:

> See e.g., FRANK HARGRAVE, HARGRAVE'S COMMC'NS
> DICTIONARY at 313 (IEEE Press 2001) (defining MAC address as
> "a 48 bit number unique to each network interface card (NIC).
> Generally, the number is programmed into the NIC at the time of
> manufacture; hence, it is LAN and location independent.") [A1595];
> see also HARRY NEWTON, NEWTON'S TELECOM
> DICTIONARY 450 (CMP Books 2002) (explaining that a MAC
> address "is in the form of a 48-bit number, formally known as an EUI-
> 48 (Extended Unique Identifier-48), which is unique to each LAN
> (Local Area Network).")[14]

A1501.[15]  This apparent inconsistency among Appellants' sources belies

Appellants' reliance on a single purported "standard industry definition," Br. 43, as

demonstrating the understanding of one of ordinary skill in the art.

   **Second**, even assuming the significance Appellants attribute to the IEEE

specification, that document contains no support for the use of MAC addresses

---

[14]    Appellants truncated this reference in their claim construction brief, omitting
the final words defining "MAC address" as unique not to a network but to a
device.  See A1599 ("MAC address" "is in the form of a 48-bit number … which is
**unique to each LAN (Local Area Network) NIC (Network Interface Card)**.  The
MAC Address is **programmed into the card**, usually at the time of manufacture."
(emphases added)).

[15]    Like these sources, the IEEE specification upon which Appellants rely states
that MAC addresses are 48 bits long.  Br. 40.  In another departure from
Appellants' proffered ordinary meaning, the BodyLAN documents define Media
Access addresses as being 7 bits long.  A1763; A1767; A1769.  Thus, while the
number of bits required by the IEEE specification allows for an astronomically
high number of unique MAC addresses suitable for use with a global network, the
number of bits required by the BodyLAN specification is more consistent with
temporary assignment of MAC Addresses by a single hub in a local network.

described in the '129 patent.[16]  Though the IEEE specification permits MAC

addresses to be "locally administered," it does not suggest the sort of dynamic

assignment and reassignment used in the '129 patent.  In fact, it counsels to the

contrary:

> The recommended approach is for each device associated with a
> distinct point of attachment to a LAN to have its own unique MAC
> address. Typically, therefore, a LAN adapter card (or, e.g., an
> equivalent chip or set of chips on a motherboard) should have one
> unique MAC address for each LAN attachment that it can support at a
> given time.

A1606.  Logically, then, based on the IEEE specification one of ordinary skill in

the art would understand ***not*** to use "industry standard" MAC addresses in the

manner described in the '129 patent.[17]

---

[16]     Appellants assert that "common roots" demonstrate that "MAC address" is
used in the '129 patent in the same way as it is in the IEEE specification.  Br. 43.
This is a non sequitur.  The supposed source for this baseless assertion is a
document that Appellants did not proffer in the district court and that is not "prior
art" in any meaningful sense because it contains no technical content of any sort.
A5786.  For example, it does not contain a single reference to MAC addresses, hub
devices, peripheral devices, device identifiers, attachment processes, or software
architectures.  *Id.*

[17]     Appellants' cited prior art does not suggest otherwise.  *See* Br. 42 (citing
U.S. Patent Nos. 6,570,857 (A3909) and 6,574,266 (A3922)).  Both the '857 and
'266 patents expressly use "MAC address" in non-standard ways.  *See* A3915
('857 patent 2:4-34 (distinguishing the use of "MAC address" from the "unique
identity" for "[e]ach unit," "which is for example derived from the 48-bit IEEE
802 address space")); A3935 ('266 patent 10:39-53 (disclosing MAC addresses
with only three bits as well as "an all-zero MAC address, [which] can be used by a
base station or other transmitter to identify broadcast messages that should be
interpreted by all piconet participants")).

Confidential material has been deleted from this page.

**Third**, there is no disclosure in the '129 patent of pre-programmed MAC

addresses.  But that is the primary usage in the IEEE specification and is described

as the "general," "usual" use of the term by Appellants' other cited references.  *See*

*supra* at p.46, n.14.



} A1709.

Appellants' construction would thus encompass a network that the inventors

neither contemplated nor described, which is not only erroneous in light of the

intrinsic and extrinsic evidence but also would render the claims invalid for lack of

enablement.  *See MagSil Corp. v. Hitachi Global Storage Techs., Inc.*, 687 F.3d

1377, 1381 (Fed. Cir. 2012) (warning that "a patentee chooses broad claim

language at the peril of losing any claim that cannot be enabled across its full scope

of coverage" in affirming summary judgment of invalidity for lack of enablement).

As a result, the construction of "MAC address" must reflect that the address is generated by the hub device.

## CONCLUSION

For the reasons set forth above, this Court should affirm the District Court's dismissal of TCEF for lack of standing, and its grant of judgment of non-infringement.

Respectfully submitted,

*/s/ DOMINIC E. MASSA*
DOMINIC E. MASSA
LOUIS W. TOMPROS
JASON H. LISS
DANA O. BURWELL
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

*Attorneys for Defendant-Appellee*
*Broadcom Corporation*

*/s/ MATTHEW J. BRIGHAM*
TIMOTHY TETER
LORI R. MASON
MATTHEW J. BRIGHAM
COOLEY LLP
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA  94306
(650) 843-5000

*Attorneys for Defendants-Appellees*
*Atheros Communications, Inc. and*
*Qualcomm Incorporated*

*/s/ JEFFREY E. OSTROW*
JEFFREY E. OSTROW
JONATHAN C. SANDERS
SIMPSON THACHER & BARTLETT LLP
2475 Hanover Street
Palo Alto, CA  94304
(650) 251-5000

KERRY L. KONRAD
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY  10017
(212) 455-2000

*Attorneys for Defendants-Appellees*
*CSR PLC, Cambridge Silicon Radio*
*International, LLC, Marvell*
*Semiconductor, Inc., Ralink*
*Technology Corporation (Taiwan), and*
*Ralink Technology Corporation (USA)*

October 3, 2013

- 43 -

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(b).

1.      Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B), the brief contains 9,984 words.

2.      The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(a)(7)(C), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.


/s/ DOMINIC E. MASSA
DOMINIC E. MASSA

October 3, 2013

## CERTIFICATE OF SERVICE

I hereby certify that on this third day of October, 2013, I served by hand two

(2) copies of CONFIDENTIAL BRIEF FOR DEFENDANT-APPELLEES, and

two (2) copies of NON-CONFIDENTIAL BRIEF FOR DEFENDANT-

APPELLEES on:

>Michael E. Joffre
>Kellogg, Huber, Hansen, Todd, Evens & Figel P.L.L.C.
>1615 M Street, N.W.
>Sumner Square
>Washington, D.C.  20036
>(202) 326-7952
>mjoffre@khhte.com

Dated:  October 3, 2013

Alprentice Davis

## CERTIFICATE OF SERVICE

I hereby certify that on this third day of October, 2013, I served by

electronic mail CONFIDENTIAL BRIEF FOR DEFENDANT-APPELLEES and

NON-CONFIDENTIAL BRIEF FOR DEFENDANT-APPELLEES on counsel of

record.


Dated:  October 3, 2013                */s/ Dana O. Burwell*_____